## LATHAM and another *v.* BARNEY and others.

*(Circuit Court, D. Minnesota.* December Term, 1882.)

1 RELEASE TO ADMINISTRATOR, RATIFYING SALE OF LANDS—FAILURE TO RESCIND, CONTRACT VOID—LACHES, ETC.

Decedent, in his life-time, was possessed of a certain interest in lands which he held with others. His acting administrator, who owns a part interest in the same lands, obtains the assent of two of decedent's heirs to the sale of decedent's interest in the said land, and forthwith conveys the same to himself and his associates. Thereafter all decedent's heirs, including the complainants, sign a release discharging him from all liability "on account of the assets and property of the deceased in his possession or under his control." In the suit brought by two of these heirs against the acting administrator and his associates, purchasers of the land aforesaid, asking for an accounting of proceeds of sales made by them, and for a conveyance to complainants of the undivided interest in the lands still unsold, *held,* that the release from the heirs of decedent to the administrator, considered in the light of a sale of their interest in the lands by such acting administrator to himself and associates, or as an agreement ratifying such a sale previously made by him, was wholly invalid, and that this being so, and it not appearing that the complainants accepted any benefit from the sale after the facts were known, they are not estopped to assert the invalidity of the sale by reason of laches, failure to rescind, and the like.

2. PROTECTION TO BONA FIDE PURCHASERS.

The protection extended to a *bona fide* purchaser belongs only to the purchaser of the legal title without notice of an outstanding equity.

In Equity.

On the thirty-first day of October, 1867, a written contract was entered into between Danford N. Barney, Jesse Hoyt, Angus Smith, William G. Fargo, Benjamin P. Cheney, Charles F. Latham, Ashbel H. Barney, Samuel M. Hoyt, and Alfred M. Hoyt, parties of the first part, and the Winona & St. Peter Railroad Company, party of the second part. By this agreement it was recited that the parties of the first part had loaned and advanced to the party of the second part large sums of money, and had made, constructed, and equipped for it 105 miles of its railroad in the state of Minnesota, whereby the said party of the second part had become indebted to the parties of the first part in a large sum of money. The contract also provides for certain payments upon said indebtedness, and for a conveyance of a portion of the land grant owned by the railroad company in settlement of the residue. This latter portion of the contract is as follows:

"Now, for the residue of the said indebtedness of the said party of the second part to the said parties of the first part, the said party of the second part hath agreed to sell and convey to the said parties of the first part as many

acres of land heretofore granted by congress to the state of Minnesota as the said party of the second part shall receive from the said state by reason of the construction of the portion of the Winona & St. Peter Railroad heretofore constructed, to-wit, 105 miles thereof, extending westwardly from Winona, excepting and reserving, nevertheless, any and all parts and parcels of such lands (if any such there be) which may be necessary for the track of said railroad, or the right of way, or any depot or depot grounds thereof, or any other purpose incidental to the operation of the said railroad constructed, or to be constructed, or any part thereof; which said lands hereinbefore agreed to be sold, shall be conveyed to the said parties of the first part, or as they shall in writing direct, whenever and as soon as the said party of the second part shall obtain a title thereto under such acts of congress. The lands to be conveyed as aforesaid shall be selected as follows:

"Beginning at Winona aforesaid, and from thence proceeding on each side of the said railroad on a course running parallel therewith, embracing each of the six, ten, fifteen, and twenty mile limits of the congressional land grants, and in proceeding taking all lands within each and all of said limits which shall be received by the said company under said acts of congress, or either of them; it being understood that on each side of said railroad an uniform line of advance westwardly, embracing all the lands in said limits, shall be maintained, as nearly as may be, until as many acres shall have been selected and taken as the said company shall have received, for the construction of the portion of the said railroad now completed, which is estimated to be 105 miles thereof, extending northerly and westerly from Winona aforesaid; it being understood that the said parties of the first part shall receive as many acres as shall be received by the party of the second part for the construction of the said 105 miles, or so much thereof as is now constructed, notwithstanding that under the acts of congress the said lands are certified only upon the completion of sections of not less than 10 miles of railroad, but reserving, excepting, and deducting from the said number of acres all lands necessary for the track of said railroad, or the right of way, or depots or depot grounds, or other purposes incidental to the operation of said railroad.

"And the said party of the second part agrees to acquire the title of said lands as fast as it may be permitted to do under said acts of congress, and to release and convey to the said parties of the first part, or to such person or persons in such manner and from time to time as may be devised by said parties of the first part, or their counsel, on the request of the said parties of the first part, or a majority of them, and will do any and every other act and thing necessary and proper to secure the said parties of the first part said lands, and every part and parcel thereof, and the proceeds thereof, if it shall be hereafter determined that the same shall be sold by the said party of the second part for the benefit of the said parties of the first part; and until the final arrangements shall be made in reference thereto, the title shall be held by the said party of the second part; and as some time is necessary to enable said parties of the first part to confer and agree upon the details in relation to the holding of the title and the mode of disposing of said lands, this clause is inserted to express the agreement of parties in relation thereto."

There was for a time some uncertainty as to the quantity of land to which the parties of the first part were entitled under this agreement, but all such uncertainty was removed by the decree of this court in the case of *Ashbel H. Barney et al.* v. *The Winona & St. Peter R. Co.*, which is in evidence, and which shows the number of acres to be 514,266.35½.

After the execution of said contract, and before any conveyance under it had been executed by the railroad company, the above-named Charles F. Latham died seized of an undivided one thirty-seventh interest in said contract and in the aforesaid lands. The said Charles F. Latham died August 25, 1870, intestate, leaving no father, mother, children, or wife. His next of kin and heirs were nine brothers and sisters, and the children of a deceased sister; but as one of the sisters had received her share of his estate in advance, it is conceded that the property of the estate vested in eight brothers and sisters, and the children of the one sister deceased; the said eight brothers and sisters, and the children aforesaid, being entitled respectively to an undivided one-ninth part thereof. The complainants are two of the brothers of said Charles F. Latham, deceased, and were each entitled at his death to one-ninth interest in his estate. No legal proceedings were ever instituted for the settlement of the estate of said Charles F. Latham, and no administrator was ever appointed; but in accordance with his wish, expressed shortly before his death, and with the consent of the heirs, for the purpose of saving the expense of administration, the defendant Ashbel H. Barney took possession of the assets of the estate, and undertook to distribute them. The estate consisted of a considerable amount of property, mostly personal, in addition to the interest in the land grant acquired under the aforesaid contract, in which latter the defendant Barney held an interest of his own as one of the parties to said contract. Some time after the death of said Latham, two of his sisters and their husbands verbally assented to a sale by defendant Barney of the interest of the estate in the aforesaid lands for the sum of $10,000, he at the time advising them that it was worth no more. It does not appear that any of the other heirs were consulted.

Prior to the ninth day of September, 1871, the defendant Barney entered into an agreement to sell the interest of the estate of said Charles F. Latham in the aforesaid lands for $10,000 to the persons who held the remaining interest, viz., the eight persons who, with said Latham, had, by the contracts aforesaid, purchased the same

from the railroad company, the said Barney being one of them. On or about the day last named the defendant Barney caused to be prepared a statement of account between himself and the said estate, and a release to be signed by each of the heirs. A sufficient number of copies of this statement were prepared to provide one copy for each heir and one for said Barney, and they were all sent by express together to each heir to be signed, and, after signing, one executed copy was sent to each. Among the copies of this statement and release was one which differed from the others in a particular to be hereafter stated. All but that one were in the following form:

"Whereas, Charles F. Latham, late of Irvington, county of West Chester and state of New York, died intestate, leaving a considerable estate, consisting of personal property, to be distributed among his next of kin, he, said Latham, having survived his wife and parents, and leaving no children or representative of a child;

"And whereas, the next of kin of said Latham, entitled to participate in the distribution of said estate, for the purpose of saving the delay and expense incidental to legal proceedings to effect such distribution, have agreed among themselves as to the division of said estate, and the amount going to and receivable by each of the next of kin, whether in money, bonds, stock, or other property;

"And whereas, the persons entitled to participate in such distribution, and who have agreed upon the same, are the following, and their respective places of residence: William H. Latham, a brother of deceased, Indianapolis, Indiana; Henry M. Latham, a brother, Thetford, Vermont; James K. S. Latham, a brother, San Francisco, California; Edward P. Latham, a brother, Waseca, Minnesota; Lucy H. Kelly, wife of Thomas M. Kelly, sister of deceased, Cleveland, Ohio; Mary Baker, wife of John G. Baker, a sister, Orange, New Jersey; Julia A. Murphy, wife of Gardner B. Murphy, a sister, Cleveland, Ohio; Sarah A. Stockwell, wife of Nathaniel H. Stockwell, a sister, Orange, New Jersey; Azuba F. Barney, wife of Danford N. Barney, a sister, Irvington, New York; the three children of Arthur Latham, a deceased brother, to-wit, Arthur and Jeanette, of Thetford, Vermont, and Julia A., wife of Francis W. Corey, of Chicago, Illinois, and all of whom are of full age except Arthur, who is herein represented by his mother, Lura A. Latham, who is guardian of his personal estate.

"And whereas, each of the above-named parties—that is to say, the brothers and sisters of the said Charles F. Latham—are entitled to one-tenth of said estate, and the children of Arthur are each entitled to one-third of a tenth thereof; except, whereas, the said Charles F. Latham, in his life-time, advanced to the said Sarah A. Stockwell all that part or portion of his estate to which she would become entitled on his death, and such advancement was accepted and received by her upon the understanding that she would make no claim whatever upon his estate on his death, but would release to the other parties entitled thereto all interest in said estate, to be divided among the others next of kin to said Latham.

"And whereas, it is now the intent to give full force and effect to such understanding: Now, therefore, said Sarah A. Stockwell, in consideration of such advancement, doth hereby release all claim on the estate of said Charles F. Latham, and agrees to distribution of the same among the next of kin, exclusive of herself; that is, to each brother and sister a ninth part thereof, and to each of the children of Arthur Latham one-third of a ninth thereof.

"Now, therefore, in consideration of the premises, and also in consideration of the distribution made to each of us of that part or portion of the estate of the said Charles F. Latham to which we, and each of us, are entitled, as above set forth and declared, the receipt whereof we, and each of us, do hereby acknowledge, we, and each of us, have released, remised, and forever discharged, and do hereby, each for himself, his heirs, his executors, administrators, and assigns, remise, release, and forever discharge the others and each of them, their heirs, executors, and administrators, from all claims and demands for the amount so received by them, and each of them, in his or her distributive share of the estate of the said Charles F. Latham, and from all debts, demands, and actions, and causes of action, growing out of or which may result from the aforesaid distribution.

"And whereas, Ashbel H. Barney, of the city of New York, at the time or subsequent to the death of the said Charles F. Latham, had in his possession, or under his control, certain of the assets and property of the said Charles F. Latham, which he has surrendered and delivered to the next of kin to the said Latham, and which property and assets entered into the aforesaid distribution, and passed to the next of kin:

"Now, this agreement further witnesseth that the said parties hereto, in consideration of the premises, and of the surrender and delivery to the said next of kin of the aforesaid property and assets, have, and each of them hath, released, remised, and discharged, and they and each of them do for himself or for herself, their heirs, executors, and administrators, remise, release, and forever discharge the said Ashbel H. Barney, his heirs, executors, and administrators, of and from all claims, demands, actions, and causes of action on account of the said assets and property of the said Charles F. Latham, so in his possession or under his control.

"In witness whereof the said parties have hereunto set their hands and seals this — day of ———, in the year one thousand and eight hundred and seventy-one."

[Signed by all the heirs, including complainants.]

Sealed and delivered in presence of
————————.

Schedule showing the estate of which the late Charles F. Latham died possessed, and the distribution among the next of kin in the foregoing agreement mentioned.

ESTATE.

| | | | |
|---|---|---|---|
| | Cash bal. at W. F. & Co.'s, | | $ 19,835 70 |
| Dec. 8. | Div. on 300 shares Adams Ex., | | 600 00 |
| Jan. 5. | " 103 " Pawtucket Horse R. R., | | 515 00 |
| " 12. | 22 W. & St. P. Coupons, | | 750 75 |
| Feb. 6. | 9 Phil. & Erie, | | 315 00 |
| M'rch 8. | Div. on 300 shares Adams Ex., | | 600 00 |
| May 6. | Division of moneys from W. & St. P. lands, | | 150 36 |
| May 6. | Semi-annual payment on contract with Chic. & N. W. R. Co., | | 1,691 90 |
| May 19. | Div. on Oil Creek stock, | | 2,312 50 |
| June 17. | Div. on 300 shares Adams Ex. stock, | | 600 00 |
| July 27. | Int. on W. & St. P. lands, | | 280 08 |
| July 27. | 22 coupons W. & St. P. 1st mge., less tax, | | 750 75 |
| July 27. | 14 coupons W. & St. P. 2d mge., less tax, | | 477 75 |
| July 27. | 3 coupons La Crosse, T. & P., less tax, | | 146 25 |
| July 27. | 5 coupons Des Moines, | | 197 50 |
| July 29. | 9 coupons Phil. & Erie, free of tax, | | 315 00 |
| July 29. | 10 coupons O., C. & A. R. R., less tax, | | 326 70 |
| July 29. | 200 shares U. S. Ex. stock at 54, | $10,800 00 | |
| July 29. | 100 shares U. S. Ex. Stock at 53¾, | 5,375 00 | |
| | | $16,175 00 | |
| | Less comm. $37.50, stamps $1.62, | 39 12 | |
| | | | 16,135 88 |
| July 31. | 300 shares Adams Ex. stock at 81⅝, | 24,487 50 | |
| | Less comm. $37.50, stamps $2.46, | 39 96 | |
| | | | 24,447 54 |
| Aug. 1. | 9 Phil. & Erie bonds at 88, less comm., | | 7,900 00 |
| Aug. 11. | Div. of moneys W. & St. P. land sales, | | 318 48 |
| Sep. 7. | 370½ shares O., C. & A. stock at 48¼, B. 30, | 17,852 50 | |
| | Int. 30 days, | 89 26 | |
| | | $17,941 76 | |
| | Less comm. and tax, | 47 60 | |
| | | | 17,894 16 |
| Sep. 7. | 10,000 O., C. & A. bonds at 85½, | 8,550 00 | |
| | Less comm. $25, and stamps. 86, | 25 86 | |
| | | | 8,524 14 |
| Sep. 9. | 5 Des Moines bonds, | | 5,000 00 |
| | Wood mortgage, | | 1,500 00 |
| | C. & N. W. debt, | | 6,772 04 |
| | Amount carried forward, | | $118,357 48 |

| | | Amount brought forward, | - | - | - | $118,357 | 48 |
|---|---|---|---|---|---|---|---|
| Sep. | 9. | Int. on W. & St. P. lands, estimated, | - | - | - | 10,000 | 00 |
| | 22 | W. & St. P. bonds, 1st mge., estimated at 100, | | - | | 22,000 | 00 |
| | 14 | W. & St. P. lands, 2d mge., at 94, | | - | - | 13,160 | 00 |
| | 3 | La Crosse, T. & P. bonds, estimated at 100, | | - | | 3,000 | 00 |
| | 7 | West Side Elevated, 20, | - | - | - | 700 | 00 |
| | 19 | shares W., F. & Co., 6, at 21, | - | - | - | 270 | 00 |
| | 250 | shares U. S. Ex. Co., 51, | - | - | - | 12,750 | 00 |
| | 103 | shares Pawtucket Horse R. Co., 75, | - | - | | 7,725 | 00 |

$187,962 48

BEQUESTS.

| | | | | | | |
|---|---|---|---|---|---|---|
| Home Missionary Society, | - | - | - | - | 2,500 | 00 |
| Foreign Missionary Society, | - | - | - | - | 2,500 | 00 |
| Thetford Mil. Academy, | - | - | - | - | 5,000 | 00 |
| Jeanette Latham awarded | - | - | - | - | 2,500 | 00 |
| A. W. C. Latham, Thetford W. R. Junction, | | | | - | 2,500 | 00 |
| 19 shares W. F. & Co., taken from Miss J. Latham at 67, $1,273; less amt. rec'd for same, $316, | | | | - | 957 | 00 |
| Monument and legal expenses, | - | - | - | | 4,000 | 00 |

19,957 00

$168,005 48

NOTE. Besides the property herein specified, there is certain real estate in California, to-wit, a 50 Vara lot, corner of California and Octavia streets, and a two-thirds interest in 20.06 acres in Alameda county. Said property Charles F. Latham desired should be given to his brother J. K. S. Latham, and a deed of which will be forwarded for the heirs to sign.

There were also debts to quite a large amount against Dr. William Latham, Gardner B. Murphy, and Payson Latham, which Mr. Charles Latham wished to have canceled and not included in any division of his estate with the legal heirs.

The remaining statement was an exact duplicate of the above, except as to the item referring to the lands, which item was as follows: "Interest in W. & St. P. land sales, say $10,000." This latter is the one sent to and returned by complainant E. P. Latham.

The complainants, alleging that the foregoing proceedings, and the execution by them under the circumstances of the release above named, did not divest them of their interest in the lands aforesaid, bring this suit for an accounting as to proceeds of sales heretofore made, and for a conveyance to them of the undivided interest in the lands still unsold. The further facts, in so far as it is deemed necessary to state them, will be found in the opinion.

*Gordon E. Cole,* for complainants.

*Thomas Wilson,* for defendants.

McCRARY, C. J.  We are clearly of the opinion that upon the facts above stated, without more, it cannot be held that the complainants have divested themselves of the interest in the lands in controversy, which they acquired by inheritance from their brother, Charles F. Latham.  It does not appear that either of the complainants were consulted about the sale of their interest to the defendant Barney and his associates, much less that they ever authorized the sale by such writing as the law requires, and the question, therefore, is whether the instrument signed by them and set forth in the foregoing statement can be held to be a valid release or conveyance, or effectual to estop complainants on the ground that it is a ratification or affirmance of the sale previously made by the said Barney.  There can be no pretense that there was anything in the paper left with the complainant E. P. Latham that can be construed into an assent to or confirmation of such sale, for in that instrument there is no reference to any sale of the interest of the heirs in the lands, but only a charge for the interest of the heirs in the "Winona & St. Peter land sales."  There is, of course, a wide difference between the interest of the heirs in the land sales and their interest in the lands themselves.  Let us assume, however, that both complainants are bound by all the statements signed by them, and thus view the question from the stand-point of the defendants.  It is more than doubtful whether the release and schedule signed by complainants, considered merely with reference to its terms, can be construed as a release of their interest in the real estate in question.  They were dealing with the administrator of their relative's estate, and they must be presumed to have known that an administrator could deal only with the personal estate.  This is not the less true because the defendant Barney was acting as such administrator without legal authority.  He was at least bound by the rules which would apply to a lawful administrator.

With this rule in mind let us look at the instrument signed by complainants and now relied upon as a release of their interest in the lands in controversy.  The very first recitation in this instrument is that "Charles F. Latham, late of the county of West Chester and state of New York, died intestate, leaving a considerable estate, *consisting of personal property,* to be distributed among his next of kin."  In the subsequent recitals the property to be distributed is referred to both as "said estate" and as "the estate of said Charles F. La-

tham," and the release proper from the heirs to defendant Barney is, as will be seen by reference to the instrument, simply a release of said Barney from responsibility for the assets and property in his possession or under his control, and which had been "surrendered and delivered to the next of kin of said Latham." Surely there is nothing in the recital of this instrument that can be construed into a ratification or approval of any previous sale by the defendant Barney of the interest of the heirs of Latham in any real estate, and there is very much which would lead even the most careful reader to conclude that it was a release only as to the assets or personal property which Barney had possessed, controlled, and distributed. We should be very reluctant to hold that the insertion of one item in the schedule which accompanies the release, by which defendant Barney charges himself with "Int. in W. & St. P. lands, estimated at $10,000," was of itself sufficient to constitute the transaction a release by the heirs of all their interests in the lands, even if the release had been executed to a stranger with whom they were dealing at arms-length, and upon terms of equality. In this connection it is worthy of remark that another item in the same schedule is couched in the very same terms, and yet confessedly refers to the proceeds of land sales, and not to a sale of land. We refer to item of date July 27th, which reads: "Int. in W. & St. P. lands, $280." If, however, we assume that there was enough on the face of the instrument to advise complainants that they were receiving and giving a receipt and release for the proceeds of the sale by defendant Barney of all their interest in the lands in question, we are still of the opinion that it did not bind complainants so far as the sale of the land is concerned, nor estop them from claiming their interest therein, for the reason that even the most formal conveyance executed by heirs of Charles F. Latham to defendant Barney, while the latter had possession of the estate and was acting as administrator, would, under the circumstances, have been absolutely void.

The case of *Michoud* v. *Girod*, decided by the supreme court of the United States in 1846, (4 How. 503,) is very instructive, and satisfactory authority upon this question. It is there held that a purchase by executors of property of the estate, even though made at open sale, and where they were empowered by the will to sell the estate for the benefit of heirs and legatees, a part of which heirs and legatees they themselves were, carried fraud upon the face of it, and was void. The rule is laid down without qualification that a person cannot legally purchase on his own account, or as an agent for others, that

which his duty or trust requires him to sell on account of another. He is not allowed to unite the two opposite characters of buyer and seller, and the sale then under consideration was set aside, after a lapse of over 25 years, notwithstanding the admitted fact that "the sale was a public auction, *bona fide*, and for a fair price." "The inquiry," say the court, "is not whether there was or was not fraud in fact. The purchase is void, and will be set aside at the instance of the *cestui que trust* and a resale ordered, on the ground that the temptation to abuse, and the danger of imposition, are inaccessible to the eye of the court." The court proceeds to discuss the question whether such sales are void, or only voidable, and while admitting that cases may be found asserting that they are voidable only, the court declares with emphasis that there should be no relaxation of the doctrine that an executor cannot become the purchaser of the property which he represents, or any portion of it, even for a fair price, without fraud, and at a public sale; much less, of course, can he purchase from the heirs at private sale, and without disclosing to them any facts concerning the character or value of the property. Numerous other authorities to the same effect might be cited, but a single decision by the supreme court of the United States, directly in point, is sufficient.

It follows that the execution of the release above mentioned, from complainant to defendant Barney, considered in the light of a sale of their interest in the lands by Barney to himself and associates, or as an agreement approving and ratifying such a sale previously made by him, was wholly invalid. It cannot be doubted that if the defendant Barney was incapable of acquiring the interest of the complainants by direct purchase, he could not acquire it by transferring the property to himself and others without the knowledge or consent of complainants, and afterwards obtaining from them a release from all liability on account of the lands. If complainants sold their interest to Barney, it was by the execution of the release. They were parties to no previous sale, and, so far as appears from the evidence, knew nothing of any such sale, except as advised by the face of the instrument itself.

Further argument is not needed to show that the complainants are not estopped to claim their interest in the lands, unless it is by something that has transpired since the execution of the release; and this brings us to the consideration of the defenses which have been pressed upon our consideration by the learned counsel for the defendants. They are: (1) That complainants have been guilty of laches,

in that they did not, when advised of the fraud, at once rescind the contract, and tender back the consideration received; (2) that the complainants have ratified and confirmed the sale by accepting, after being fully advised, a balance of purchase money from defendant Barney.

As to the defense of laches and failure to rescind and return consideration, it may be said in the first place that the transaction complained of, being, as we have seen, absolutely void, there is nothing to rescind. The complainants have never parted with any interest in the land. The contract under which it is claimed that they have done so, being contrary to sound morality and public policy, is in fact and in law no contract, and it is, to say the least, doubtful whether it is capable of confirmation or ratification, even by affirmative action. The only effect of a failure to rescind is to ratify and make valid that which is otherwise voidable. Equity regards a purchase by a trustee or executor of the property or estate placed in his hands to manage for others as immoral, and contrary to public policy; and so the supreme court declares, in the case above cited, that the general rule which prohibits such purchases "stands upon our great *moral* obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity." We should be very reluctant to hold that such a contract is ratified, confirmed, and made valid by the failure of the *cestui que trust* to rescind at once upon discovering the facts. It is not necessary to decide the question whether the heirs, in such a case as the present, can, after being fully advised, by an affirmative act confirm such a sale, for no such question is before us. The voluminous correspondence which is in evidence shows that complainants distinctly disaffirmed the sale as soon as they were fully advised, and that the parties entered into no negotiations respecting the repayment to defendant Barney of the sum distributed by him to the heirs as proceeds of the sale of the lands.

Again, we are of the opinion that the doctrine we are considering has no application to a purchase by a trustee from his *cestui que trust*, especially where there is an accounting to be had between them, and the trustee has in his hands funds belonging to the *cestui que trust*. In such a case the latter may, at any time within the statute of limitations, bring a suit to set aside the sale, by offering to submit to an accounting, and to pay any balance which may be found due the trustee. We have seen no case, nor do we think one can be found, in which the rule with respect to rescission and the return of the price has been applied to such a sale as the one now under consideration.

That rule applies only to contracts entered into between parties who deal at arms-length. This is well illustrated in the case we have already cited, (*Michoud* v. *Girod*,) where the defense of laches was relied upon and overruled. In that case the executors of Girod had purchased the property of the estate at public sale in the year 1814, and in 1817 two of the complainants had executed formal releases to the executors for their share of the proceeds. It was not until about the year 1844 that suit was brought to set aside the sale to the executors, and yet there was no allegation of an offer to rescind the releases, and to return the money received prior to the bringing of the suit. It was held that the rights of the complainant were not affected by the releases, because they had been executed without "full knowledge of all the circumstances connected with the disposal and management of the estate;" but it was not suggested, either by the eminent counsel or by the court, that they were bound to rescind at once upon discovering the fraud.

Where a trustee, in violation of its trust, purchases the estate of his *cestui que trust*, the right of the latter to relief does not depend upon his having formally rescinded the sale. All that is required is that he shall apply for relief within a reasonable time, and this, as we have seen, may sometimes be a long term of years, and relief "will be granted upon the terms of the *cestui que trust's* repaying to the trustees the amount of the purchase money paid by him, together with interest, * * * while the trustee, or the purchaser with notice, will have to account to the *cestui que trust* for the rents and profits of the estate." Hill, Trust. 539. In other words, there is to be an accounting, and, in all such cases, all that is necessary is that the party seeking the relief shall offer to submit to an accounting, and to pay over any balance in his hands. If this were not the rule, it might result that the *cestui que trust* would be required, as a condition precedent to his right to recover, to pay over to the trustee more than his due.

The present case well illustrates this rule. These complainants received two-ninths of $10,000 from defendant Barney, which the latter insists was their share of the proceeds of the sale of their interest in the lands. The said Barney and his associates, having control of the complainant's interests in said lands, went on and made numerous sales. Before the complainants were fully advised of all the facts, and of their rights, a large sum had doubtless been realized by defendant Barney from such sales. Clearly, it cannot be maintained that complainants were bound to return the whole amount received. It does not appear how much was due. The duty of

Barney to pay over the proceeds of sales was just as imperative as that of complainants to return the consideration. All that either party could demand was a settlement,—an accounting,—and the payment of any balance due. In view of these considerations, without adverting to others, we are constrained to hold that complainants are not barred by laches, nor by their failure to formally rescind and tender back the consideration.

It is contended, in the next place, that complainants are estopped from denying the validity of the sale in question because they received a part of the consideration after a knowledge of the fraud, and thereby confirmed the transaction. The general rule, no doubt, is that the taking of any benefit under a contract, after knowledge of the alleged fraud, is a ratification of the contract. We will not stop to consider whether this doctrine applies to a contract that is absolutely void as against good morals and public policy, for, even conceding that it does, we are clearly of the opinion that it has no application to the facts of this case. It appears that the statement and schedule quoted in the foregoing statement were presented to complainants and the other heirs as a full and final settlement and distribution of all personal estate in the hands of defendant Barney. It appears upon its face to have been intended as a final distribution. There was, however, one item credited to said Barney designated "monument and legal expenses, $4,000." This sum was left in the hands of the said Barney for the purposes named. Some time afterwards it was determined not to erect a monument, but to substitute a tombstone of comparatively small cost. This, of course, left a balance in Mr. Barney's hands and made a further distribution necessary. In the statements sent to complainants with a remittance of their respective shares of this balance, no mention is made of the land sales, or their proceeds. It seems to have been understood that it was a separate and distinct matter.

A long correspondence about the sale of the land and the disposition to be made of the $10,000 distributed on that account, had preceded the disposition arising from the non-use of the monument fund, and was still pending. The matter of the alleged sale of the interest of the heirs in the land for $10,000 had been long discussed by itself as a separate and distinct matter, and the evidence very clearly shows that complainants did not understand that they were adjusting that matter by accepting the last balance sent them. On the contrary, it appears beyond a doubt that they understood exactly

the contrary, for it is shown that when that balance was first sent to them it was accompanied by a formal release of defendant Barney from all claim on account of the proceeds of the sale of the lands, and a confirmation of said sale, which release and confirmation they both refused to sign. They refused to receive the money tendered them on condition that they would sign this document, and gave as a reason their unwillingness to confirm the alleged sale, and subsequently Mr. Barney sent them the money and accepted a simple receipt for it. Here is conclusive evidence that there was no intention to ratify the sale of the land by accepting this balance, and we apprehend that the rule of law relied upon by counsel for defendants rests upon the fact that the receipt of part of the consideration for a contract with full knowledge that it is fraudulent, shows a purpose to accept the benefit of the contract, and is therefore an affirmance of it. In the present case, the evidence does not show that complainants actually received a part of the $10,000 after they were advised of all the facts. It only shows that they settled with Barney for the balance left in his hands for "monument fund and legal expenses," and not used for those purposes, and that the settlement was made when a separate negotiation was in progress with respect to the land matter, and it shows that complainants regarded the two as separate and distinct.

We hold, therefore, that complainants are not estopped to assert the invalidity of the sale in question upon the ground that they ratified and confirmed it by accepting a benefit from it after being advised of all the facts.

It was suggested in the argument that some of the defendants are *bona fide* purchasers of interests in the lands without notice of complainants' rights. This point is not well taken. The legal title is in the railroad company, and the equitable title only in the purchasers under the contract of sale. The protection extended by a court of equity to a *bona fide* purchaser belongs only to the purchaser of the legal title without notice of an outstanding equity. He who purchases no legal title is not protected, even though without actual notice. *Butler* v. *Douglass*, 1 McCrary, 630; [S. C. 6 FED. REP. 228 ;] Story, Eq. Jur. § 1502; *Vattier* v. *Hinde*, 7 Pet. 252.

We are not advised that any of the defendants claim to have purchased from the railroad company without notice of the contract, or of the rights of the purchasers under it. If any such claim is made it can be considered hereafter.

Our conclusion is that the attempted purchase of the interests of the complainants in the lands in question by the defendant Barney for himself and his associates was and is void, and that the complainants are entitled to a decree so declaring, and to an accounting.

The case will be referred to a master to take further proof and report to the court as follows:

(1) The number of acres of land sold or disposed of out of the lands described in the bill since September 9, 1871, the dates of sales, the prices at which sold, and the sum total realized therefor.

(2) To this sum total the master will add interest on the several sums at 7 per cent. per annum from the date when received, and from the total thus obtained will deduct the sums received by complainants respectively from defendant Barney; also all necessary and reasonable expenditures by the defendant, or any of them, in making such sales, and for the payment of taxes, with like interest on each of said sums.

(3) And he will find and report what sum, if any, is due the complainants as their share of the proceeds of such sales.

(4) Said master will also find and report what number of acres of said land remains unsold, and a description thereof.

NELSON, D. J., concurs.