HOPKINS et al. v. HEBARD et al.

(Circuit Court of Appeals, Sixth Circuit. October 2, 1911.)

No. 2,031.

1. EQUITY (§ 455*)—BILL OF REVIEW—NEWLY DISCOVERED EVIDENCE.

The filing of a bill of review on the ground of newly discovered evidence is not a matter of right, but leave may be granted or refused by the court in the exercise of a sound discretion, in view of the circumstances of the particular case.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 1111; Dec. Dig. § 455.*]

2. EQUITY (§ 450*)—BILL OF REVIEW—RIGHT OF—PURCHASER PENDENTE LITE.

Purchasers of land from one of the parties to a suit involving the title to a portion of the tract, which had been adversely decided and was then pending on appeal, by a conveyance which expressly excepted the tract in dispute from the covenant of warranty, held not entitled to maintain a bill of review on the ground of newly discovered evidence six years after the affirmance of the decree by the appellate court, as against a purchaser in good faith from the prevailing party after the final decree and in reliance thereon.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 1095; Dec. Dig.. § 450.*]

3. VENDOR AND PURCHASER (§ 224*)—BONA FIDE PURCHASERS—HOLDERS BY QUITCLAIM.

A grantee under a quitclaim deed may be a bona fide purchaser.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 469–473; Dec. Dig. § 224.*]

4. EQUITY (§ 456*)—BILL OF REVIEW—DEFENSES—EFFECT OF GRANTING LEAVE TO FILE.

The granting of leave to file a bill of review is not such an adjudication of the equitable right of the party to maintain it as to preclude a consideration of the question on final hearing and on appeal.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 456.*]

Severens, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

Bill of review by W. R. Hopkins and others against Charles Hebard, the Smoky Mountain Land, Lumber & Improvement Company and others. From a decree dismissing the bill of review, complainants appeal. Affirmed.

The following is the opinion of the Circuit Court by McCall, District Judge:

The case of Charles Hebard against D. W. Belding and others was pending and determined in the Circuit Court of the United States for the Northern Division of the Eastern District of Tennessee, and, on appeal, in the United States Circuit Court of Appeals for the Sixth Circuit. (103 Fed. 532.)

The purpose of the bill filed by Hebard in the original case was to restrain trespass and remove a cloud from the title to a large tract of wild mountain land claimed to lie within Monroe county, Tenn. The complainant claimed title to the land under a grant from the state of Tennessee. The defendants claimed title to the land under a grant from the state of North Carolina. The title turned upon the location of the boundary line between the state of Tennessee and the state of North Carolina. The object of the bill was to have the state line ascertained and determined between the points where the state line crosses the Little Tennessee river and the junction of Hangover and Big Fodder Stack ridges, near a mountain peak called Stratton Bald, a distance of about eight miles.

The claim of complainant, Hebard, was that the state line reaches the Little Tennessee river about one-half mile above, and nearly east, of where Slick Rock creek empties into said river; that it there crosses the river and follows a leading ridge of the mountain known as Hangover ridge, and along the extreme height of that ridge to its junction with "Fodder Stack" ridge. This contention, if sustained, places the lands lying between Slick Rock creek and Hangover ridge within the state of Tennessee, and would confirm the title to complainant Hebard under his Tennessee grant.

The defendants to the bill contended that the state line crosses the Little Tennessee river at or near the mouth of Slick Rock creek and runs up said creek, following its meanders, about five miles, thence up Little Fodder Stack ridge to Big Fodder Stack ridge, and thence southwesterly with the crest of Big Fodder Stack ridge to the junction with Hangover ridge, at or near "Stratton Bald" point. This contention, if sustained, places the lands lying between Slick Rock creek and Hangover ridge within the state of North Carolina, and would defeat the title of complainant Hebard under his Tennessee grant.

When the case was at issue, it was referred to Asbury Wright, Esq., as special master, to hear the evidence and to determine and report to the court "the true state line between the states of Tennessee and North Carolina from the Little Tennessee river to the junction of Hangover and Fodder Stack ridges, as run and located by the Commissioners of the states of North Carolina and Tennessee in 1821, and confirmed by the respective Legislatures of said states." Special Master Wright's report was submitted July 7, 1898, wherein he finds and reports, among other things, as follows, to wit: "After a careful consideration of the whole case, I am of the opinion, and so report, that the line between the states of Tennessee and North Carolina from the Little Tennessee river to the junction of the Hangover and Fodder Stack ridges, as run and located by the commissioners of said states, in 1821, and confirmed by the respective Legislatures of said states, crosses the Little Tennessee river at a point where it reaches the river on the northeast side, and from the river runs up the Hangover lead, as shown on complainant's map, and along the extreme heights of this ridge, passing the black or red oak, Slick Rock Gap, Cold Springs Knob, Big Flat Knob, Hangover, Haoe, Grassy Gap, and Stratton Bald, to the junction of Hangover with Fodder Stack."

Defendants filed exceptions to this report, which were heard by the court, and on June 10, 1899, a decree was entered, overruling the exceptions and confirming the report of the special master in all things. The court found and decreed the line between the states of Tennessee and North Carolina to be located as reported by the special master, and that the titles of the complainant to the lands described in the bill were valid, and the titles claimed by defendants thereto were void, etc. From this decree of the Circuit Court an appeal was prayed and prosecuted to the United States Circuit Court of Appeals for the Sixth Circuit at Cincinnati, Ohio, where the same was heard on March 14, 1900, and decided July 13, 1900, in an opinion by Judge Lurton, in which he carefully reviewed the whole case, affirming the decree of the Circuit Court. Charles Hebard v. D. W. Belding et al., 103 Fed. 532, 43 C. C. A. 296.

On August 6, 1907, more than seven years after this final decree was made and entered by the Circuit Court of Appeals, W. R. Hopkins et al.

presented their petition to this court, alleging that on October 29, 1900, they became the purchasers of the 8,000 acres of land involved in the case of Hebard v. Belding et al., and praying that they be permitted to file a bill of review which accompanied the petition, and in which was set out certain newly discovered evidence. This new evidence, it is alleged, when considered with the evidence in the original case, would lead the court to a different conclusion, and enable the court on reconsideration to right said petitioners in matters in which they were aggrieved by the decree in the original case. And it appearing to the court by affidavits and a certified transcript of the record in the United States Circuit Court of Appeals for the Sixth Circuit, where said original case was decided on appeal, in which court, as appeared by said transcript, a petition for leave to file a bill of review was filed and leave given to apply to this court. Upon consideration this court permitted the bill of review to be filed, subject to all legal objections by demurrer, answer, plea, or otherwise as the defendants may be advised.

Thereupon the bill of review was filed, and, after stating the history of the original case, it is alleged: That while said original case was pending, on, to wit, December 9, 1899, the interests of all the defendants thereto in the lands involved in that case, except Braggs and Coopers, came to petitioners, W. R. Hopkins and his associates, and the title to said land is vested in said Hopkins and his associates. That some time in the year of 1905 the map made by the original commissioners of the states of North Carolina and Tennessee, who ran the line under the cession act (2 Ired. & B. Rev. St. N. C. p. 171), was discovered in a barrel of waste at Nashville, Tenn. A certified copy thereof is attached to the bill of review. That in February, 1906, one M. E. Cozad heard a rumor for the first time of the discovery of said map, and that he obtained on the 26th day of February, 1906, a certified copy thereof. That further attempts were made to find the written report of said commissioners accompanying the map, and the field notes of the survey, but, after the most diligent search, no other papers connected therewith could be found. That none of the grantees had any information of the finding of said map, and none of the defendants herein knew of it until about June 26, 1906, and the existence or contents of said report could not have been proven at the trial of the cause.

It is alleged: That said newly discovered map shows that the state line "crosses the Little Tennessee river at or near the mouth of Slick Rock creek, and that it includes all the land, and more, than said defendants claimed." That said map is new and decisive evidence of the contention of the defendants in the original case, and that, if it had been found and presented to the court, would have been decisive in favor of the defendants, and would have resulted in a decree in their favor. That petitioners and their grantees have exercised true and perfect diligence, and could not have ascertained the existence thereof sooner than it is alleged.

On August 6, 1907, the day in which the petition was filed praying for permission to file the bill of review, an order was made and entered, directing that a rule issue and be served on the Smoky Mountain Land, Lumber & Improvement Company, grantees of Charles Hebard, the complainant in the original case, and T. E. H. McCroskey, attorney representing said company, to show cause why the prayer of said petition should not be granted and directing said company to answer thereto on or before the next rule day of this court, which was September 2, 1907. The said land company filed its answer to the petition and to the bill of review, setting up the following defenses necessary to be noticed: The suit sought to be reviewed was finally heard and determined in the United States Circuit Court of Appeals for the Sixth Circuit, July 13, 1900. The application by W. R. Hopkins et al. to file a bill of review was first made in the said United States Circuit Court of Appeals September 25, 1906. On August 6, 1907, said Hopkins and others filed in this court their petition to file a bill of review in said suit.

The petitioners and all other parties are barred by the statute of limitations. Section 4848, Shannon's Code of Tennessee, provides that "no bill

of review shall be brought or a motion made therefor, except within three years from the time of pronouncing the decree," with certain exceptions not material here. Acts 1801, c. 6, § 53, Legislature of Tennessee. The newly discovered evidence, the map itself, is not such evidence as is decisive or controlling in character as to the essential merits of the litigation, or would justify the court in granting the relief prayed for in the bill of review. The petitioners having purchased the right, title, and interest of Belding et al. to the lands in dispute, after title to said lands had been by final decree vested in Hebard and before the discovery of any new evidence, have no interest which gives to them a right to secure a reversal of said final decree upon newly discovered evidence. The land company having in good faith purchased the right, title, and interest to said lands from Charles Hebard, the successful party in the suit sought to be reviewed after final decree vesting title in Hebard, its title cannot be affected by this bill of review filed by complainants, based upon newly discovered evidence, which was not discovered until after the land company purchased. The laches of complainants bars their right to any benefits from a bill of review.

An attentive examination of this record leads me to the conclusion that the relief sought by those filing the bill of review should be denied upon more than one of the grounds relied upon by the defendants. I shall content myself, however, with discussing only one of them, and that one goes to the merits of the controversy, and in my judgment is clearly conclusive of the case.

It must be assumed at the outset that the original case of Hebard v. Belding et al. was decided correctly upon the testimony in that case. That decision must stand as the law of that case, and is not now subject to review, except in connection with the newly discovered evidence set out in the bill of review. As has been seen, the question to be determined in the original case was the correct location of the boundary line between the states of North Carolina and Tennessee, and especially between a point on the North Bank of the Little Tennessee river and the point of junction of Hangover and Big Fodder Stack ridges, a distance of about eight miles. By final decree in the original case it was held that said state line between these two points runs from the Little Tennessee river to and along the crest of Hangover ridge, to its junction with Big Fodder Stack. Why? Because, as pointed out by Judge Lurton in Hebard v. Belding et al., 103 Fed. 532, 43 C. C. A. 296, the cession act of North Carolina of 1789 (2 Ired. & B. Rev. St. N. C. p. 171) provides, among other things, that the line between Tennessee and North Carolina shall run "to the top of Bald Mountain; thence along the extreme heights of the said mountain to the Painted Rock, on French Broad river; thence along the highest ridge of said mountain to the place where it is called the Great Iron or Smoky Mountain; thence along the extreme height of the said mountain to the place where it is called Unicoy or Unaka Mountain." It is as to the last run named that the dispute arises, and from the point where the line reaches the Little Tennessee to a point, about eight miles southwesterly thereof, at the junction of Hangover and Big Fodder Stack ridges.

The act of the Tennessee Legislature 1821 (chapter 35, p. 45), confirming the report of the commissioners, after the Little Tennessee is reached, provides as follows: "From the Tennessee river to the main ridge and along the extreme height of the same to a place where it is called the Unicoy or Unaka Mountain." "The general course of the line," says Judge Lurton in Hebard v. Belding et al., supra, "as called for by the calls which brought the line to the river, was southwesterly, and this course was to be continued to the Unaka. This course would require the line to cross the river. The general direction of the cession act would keep the line on the extreme height of the mountain range or ridge. Immediately across the river, and in the general course of the line was the Hangover ridge." This is the main or highest ridge, and is the course which the line was given by the Circuit Court and approved by the Circuit Court of Appeals.

Now, what is there in the newly discovered map that would have warranted the Circuit Court in rendering a different decree in the original case, and to have found in favor of the defendants in that case? Upon an examination of the newly discovered map, it appears that the state line crosses the Little Tennessee river at right angles, and at the point where the line first reaches the river, and that it proceeds in a southwesterly direction along the ridge, lying adjacent to and immediately south of the river, towards the Unicoy Mountains. There is a black line upon the newly discovered map, marked "creek" which forms a junction with the Tennessee river a short distance above where the line crosses the river, and east of the line. But there is no indication upon the map, nor in the report accompanying it, that this line ran up said creek for any distance, or that it touches the creek at any point. Indeed, if the line followed either the river or creek for any distance, that fact is not indicated upon the map, nor is there any reference to such thing in the commissioner's report.

In order that the map or the report of the commissioners be of any service to the petitioners, it should show that the state line, after crossing the river, followed Slick Rock creek, if, indeed, it be Slick Rock creek that is indicated on the map, to a junction with Little Fodder Stack. From the location of this stream marked "creek" on the map, considered in the light of all the evidence in the case, I am inclined to the opinion that it is Cheoah river, and not Slick Rock creek. The map and the report upon their faces failing to shed any new light upon the issues in the original case, let us examine the evidence taken upon the issues under the bill of review.

Here we are met with the testimony of witnesses seemingly of equal credibility and of equal opportunity to know the facts about which they testify that is contradictory and unreconcilable. Instead of elucidating the newly found map, it tends to confuse that which appears upon the face of the map, and also it is confusing in its relation to the evidence and findings in the original case. Indeed, if this map sheds any additional light upon the issues, it is to make clearer and more certain the correctness of the conclusion reached in the original case, now under review.

An examination of the commissioners' map discloses that the state line approaches the north bank of the Little Tennessee river, running in a southwesterly direction, crosses it at right angles, leaving the south margin of the river in a southwesterly direction immediately at the point of crossing, and runs along the crest of a ridge toward Unaka Mountain, and in this particular follows the direction of the cession act from the Smoky to the Unaka Mountains, wherein it is provided as follows: "Thence along the extreme height of the said mountain to the place where it is called Unicoy or Unaka Mountain." The report of the commissioners and the confirmatory acts of the North Carolina and the Tennessee Legislatures all use identical language in describing this line from the Tennessee river, to wit: "From the Tennessee river to the main ridge and along the extreme height of the same to the place where it is called the Unicoy or Unaka Mountain." This is the course and location given the state line by the final decree in the original case. There is nothing in the newly discovered evidence to warrant this court, in holding that, had it been before the court at the original hearing, a different conclusion would have been reached, but, on the other hand, the newly discovered evidence rather tends to strengthen the correctness of the original decree. It would require a far stretch of the imagination to hold that the newly discovered map, which is silent on this point, except the use of the word "creek," is sufficient to warrant the court to reverse the holding in the original case, and write upon the face of the map, and into the commissioners' report, according to the showing on the Burns' map, the words: "Thence along the North bank of the Tennessee river to the mouth of Slick Rock creek; thence westerly up said creek with its meanderings about five miles to Little Fodder Stack lead; thence along the extreme height of Little Fodder Stack to Big Fodder Stack; thence along the crest of Big Fodder Stack to its junction with Hangover."

194 F.—20

Yet this, in substance, must be done, if the petitioners are granted the relief sought by their bill of review.

As indicated above, there are other grounds upon which the relief sought by the bill of review should be denied, but I prefer to base my action upon the ground that the newly discovered evidence, if it had all been before the court at the original hearing, would not have led the court to a different conclusion than the one reached.

It is pointed out in the brief of counsel for petitioners that Judge Clark in deciding the original case in the Circuit Court said that "it is a very close case on the facts and the equities of the case are rather with the defendants," etc. And that Judge Lurton, speaking for the Circuit Court of Appeals, said that "the case, on the whole, is one not free from doubts," etc. And it is argued from this language and the further fact that permission was granted to file the bill of review that the court granting such permission must have entertained the opinion that the bill of review was of sufficient merit to warrant the Circuit Court in granting the relief sought by it. If this were all, or the substance of all, that was said by these learned judges in the decision of the original case, it might be of great weight in tending to support the contention of the petitioners, but this is not all, or the substance of all, that was said.

Judge Clark used this language in his opinion deciding the case: "I do not underestimate the great force found in the better marked line of the defendant. It must not be forgotten, however, that the commissioners, in surveying and marking the line, followed the mountain range down to the Tennessee river, and that, according to the calls actually made, they would cross that river and proceed along the mountain crest, where complainants contend the line is. It was the crest of this same mountain range which brought them to the river, and it was the obvious and conspicuous range to have followed by directly crossing the river and keeping up the previous course. It is extremely difficult to believe that the commissioners at this point would have dropped down the river for half a mile and then followed Slick Rock creek for a distance of five or six miles without ever making the slightest reference to this water stream.

Granting, as argued, that the creek may at that time have had no name whatever, nevertheless, it would have been so natural and so necessary to avoid misleading for the commissioners to have said that they changed their course, and, instead of going directly across the river, went down, and then followed a creek or water stream up the valley and then to the ridge which led out to the junction, that it is next to impossible to think that such a deviation as this would have been made without a word to give any indication of the fact. Following the calls as actually given, it would be impossible to run the line as claimed by the defendants. "Looking at the case from the legal point of view (and no other seems permissible), I am certain that by the weight of the evidence the case is with the complainants." This is a positive statement of the law and the evidence in the original case as viewed by Judge Clark, expressed in clear and positive terms, and this view was affirmed on appeal after careful consideration by the Circuit Court of Appeals composed, as then constituted, of Judges Taft, Lurton, and Day.

But this is not all. When application was made to the Circuit Court of Appeals for leave to file the bill of review, that court declined to act upon it further than to enter an order allowing the petitioners to make application to the Circuit Court that originally tried the case for permission to file the bill of review. This application was made before the late Judge Clark, and in passing on it he said: "It does seem upon examination of this case that there is no ground on which the success of the proposed bill might finally be expected." Yet out of a great abundance of caution he permitted the bill of review to be filed, because, as he said, he was not sure that his act in refusing the application would be subject to review. So it appears from these utterances of the court trying the original case that it was satisfied that the conclusion reached in that case was correct. It further appears that Judge Clark, after having considered the bill of review, in which was

set out the newly discovered evidence, was of opinion that there was no ground set out therein on which the relief prayed for might finally be expected.

In that view I concur. An order will be entered denying the relief prayed. for, and dismissing the bill of review, with costs.

C. B. Matthews, for appellants.

W. A. Stone and J. F. Shields, for appellees.

Before SEVERENS and KNAPPEN, Circuit Judges, and COCHRAN, District Judge.

KNAPPEN, Circuit Judge. The appeal in this cause is from a decree of the Circuit Court dismissing the bill filed to review and reverse the decree of this court in Belding v. Hebard, the opinion in which case is reported in 103 Fed. 532, 43 C. C. A. 296. The bill in the original cause was filed by Hebard against Belding and others to quiet the title of, and restrain trespasses upon, the tract in question, containing (according to the allegations of the original bill) about 8,000 acres, and, as stated in one of the briefs of counsel, about 6,600 acres; Hebard claiming under grants from the state of Tennessee, Hopkins and his associates claiming under grants from the state of North Carolina.

The decision in the original suit turned upon the location of a portion of the boundary line between the states of Tennessee and North Carolina, as run in 1821 by commissioners appointed by the respective states. This court affirmed the decree of the Circuit Court, which was rendered in accordance with Hebard's contention as to the location of the boundary line, and thus held that the lands in dispute were in Tennessee and Hebard's title thereto good under the Tennessee grant. Before the final decree of this court (which was rendered July 13, 1900), but after the decree of the Circuit Court in the original case, Belding and his associates conveyed to Archer and McGarry, in trust, for the payment of certain indebtedness, a large tract of land of which the lands here in question formed part; and, after the final decree of this court, Archer and McGarry, trustees, conveyed to Hopkins and his associates, appellants here, the lands so conveyed to said Archer and McGarry by Belding and his associates. The contract of sale, in pursuance of which the deed was given, declared that it was dependent upon the condition that "there shall not be less than 38,000 acres of land in the purchase." The deed of conveyance to Hopkins and his associates recited that the conveyance from Belding and his associates to McGarry and Archer was subject "to all deductions, if any, arising by, through or under the 'state line' suit hereinafter mentioned. Grants Nos. 8,100 for 16,800 acres, and No. 2,336 for 14,800 acres, above mentioned, being for the same lands," and contained this further language:

"But there is especially excepted from the covenants of this conveyance, all those lands situated at or near the state line, between the state of North Carolina and Tennessee, which were recovered in a certain action known as the 'state line' suit which was pending in the United States Circuit Court for the Eastern District of Tennessee and was brought by one Hebard against David W. Belding and others if future proceedings do not recover the title thereof."

Immediately after the final decree of this court, Hebard sold the lands in question, as part of a total acreage of 41,000 acres, to Blaisdell and others, who later conveyed the same entire tract to the Smoky Mountain Land & Improvement Company, which purchased with knowledge of the final decree and in reliance upon it. September 25, 1906, and thus more than six years after the final decree of this court, Hopkins and his associates asked leave to file a bill in the name of the original defendants, Belding and his associates, but on behalf of Hopkins and his associates, to review said decree, upon the ground that the then newly discovered map of the commissioners' location furnished evidence controlling and decisive of the actual location of the boundary line according to the contention of Belding and his associates, and thus that the lands here in question are in the state of North Carolina, and so belonged to Hopkins and his associates by virtue of the grants from that state. The Smoky Mountain Company was given 'notice of this application, and allowed to intervene for the protection of its rights. This court granted the petition to apply to the Circuit Court for leave to file a bill; the per curiam opinion filed in connection with said order containing the following statement:

"Without deciding any question which may be involved in the application for leave to file such a bill, this court, for reasons satisfactory, now consent that the petitioners may apply directly to said Circuit Court, which court will grant or refuse permission as it may be advised."

The judge of the Circuit Court said in his opinion that it seemed to him that:

"There is no ground on which the success of the proposed bill of review might finally be expected. The objections which are made to permitting this bill to be filed go to the very merits of the bill, and can, and in my opinion should, more properly be taken up by demurrer to the bill if filed. If, in the exercise of discretion, I refuse to allow the bill of review to be filed, it is not certain that my refusal to do so would be subject to review. On the contrary, if the bill is filed and a demurrer should be sustained to it on the same grounds that are now urged against its filing, the action of the court would be subject to easy review, and so the petitioners for review would suffer no error at the hands of this court that could not be readily corrected. In view of these considerations I have determined to allow the bill of review to be filed, subject, of course, to all legal objections by demurrer, answer, plea or otherwise, as the defendants may be advised, and it is ordered accordingly."

The Smoky Mountain Company, both by answer to the petition for leave to file the bill and by its answer to the bill as filed, raised the objections, among others, that appellants, being assignees of the original defendants, could not properly file such bill, and that the Smoky Mountain Company, being a good-faith purchaser for value, should be protected in its purchase as against the leave asked; and in answer to the petition for leave to file invoked the rule, among others, that a bill of review may be refused although the evidence, if admitted, would change the decree, when the court, looking to all the circumstances, shall deem it productive of mischief to innocent parties or for any other cause unadvisable.

The Circuit Court, upon hearing on pleadings and proofs, dismissed the bill of review, saying in its opinion that relief should be denied

upon more than one of the grounds relied upon by defendants, but basing its decision specifically upon the fact that the newly discovered evidence was not such as to show that the original decree was wrong. Belding and his associates did not appeal from this decree of dismissal, the appeal being taken by Hopkins and his associates "prosecuting a bill of review herein in the name of the original defendants."

[1] In the opinion of a majority of the members of this court, the decree of the Circuit Court, dismissing the bill of review, should be affirmed. This bill of review is not filed for error apparent upon the face of the decree, but solely for newly discovered evidence. The rule is well settled that while a bill of review, on account of error upon the face of the decree, may be filed as matter of right, the granting of a bill of review on account of newly discovered evidence is not of right but of sound discretion in the court. In Dexter v. Arnold, 5 Mason, 303, 315, Fed. Cas. No. 3,856, Justice Story, speaking of such a bill, said:

"It may be refused, therefore, although the facts, if admitted, would change the decree, where the court, looking to all the circumstances, deems it productive of mischief to innocent parties, or for any other cause unadvisable. Bennet v. Lee, 2 Atk. 528, Wilson v. Webb, 2 Cox, 3, and Young v. Keighley, 16 Vez. 348, are strong exemplifications of the principle."

The rule thus laid down by Justice Story is not only adopted by the text-books generally, but has been declared and affirmed by numerous decisions, which, as well as the text-books, have generally stated the rule in the precise language of Justice Story. 2 Daniell's Ch. Pr. 1577; Story's Eq. Pl. § 417; Hughes v. Jones, 2 Md. Ch. 289, 296; Harris, Adm'x, v. Edmondson, 3 Tenn. Ch. 211; P. & M. Bank v. Dundas. 10 Ala. 661, 669; Massie's Heirs v. Graham's Adm'rs, 3 McLean, 41, Fed. Cas. No. 9,263; Craig v. Smith, 100 U. S. 226, 233, 25 L. Ed. 577; Ricker v. Powell, 100 U. S. 104, 107, 25 L. Ed. 827; Thomas v. Harvie's Heirs. 10 Wheat. 146, 150, 6 L. Ed. 287; Stockley v. Stockley, 93 Mich. 307, 313, 53 N. W. 523.

In Ricker v. Powell this language was used:

"A bill of review on the ground of newly discovered matter can only be filed on special leave, which depends on the sound discretion of the court to which the application is made. Thomas v. Harvie's Heirs. 10 Wheat. 146 [6 L. Ed. 287]; Rubber Company v. Goodyear, 9 Wall. 805 [19 L. Ed. 828]; Story, Eq. Pl. 421c; 2 Daniell, Ch. Pr. (4th Ed.) 1577. 'It may be refused, although the facts, if admitted, would change the decree, when the court, looking to all the circumstances, shall deem it productive of mischief to innocent parties, or for any other cause unadvisable.' Story, Eq. Pl. § 417; Griggs v. Gear, 8 Ill. [3 Gilman] 2."

In Craig v. Smith it was said:

"There is no universal or absolute rule which prohibits the courts from allowing the introduction of newly discovered evidence under a bill of review to prove facts which were in issue on the former hearing. 'But the allowance of it is not a matter of right in the party, but of sound discretion in the court, to be exercised cautiously and sparingly, and only under circumstances which demonstrate it to be indispensable to the merits and justice of the cause.' Such was the language of Mr. Justice Story in Wood v. Mann. 2 Summ. 334 [Fed. Cas. No. 17,954], and he states the rule none too strongly."

In Stockley v. Stockley it was said:

"An application for leave to file a bill of review is the method employed to obtain a rehearing and to vacate a decree after its enrollment; but the results to be attained, and the facts properly to be considered, are the same as though it were a motion for a new trial, or a motion for a rehearing and to vacate a decree before its enrollment, and in like manner it addresses itself to the fair discretion of a court. In passing upon it, each case stands by itself, and is controlled by the circumstances surrounding it, and without reference to any other case. The power of the court in granting or denying it is largely discretionary, and is always to be exercised in view of the peculiar circumstances of each case, so as to effectuate substantial justice, and protect the legal and equitable rights of the parties."

[2] In the opinion of a majority of the court the case is one calling for the application of the principle recognized by the decisions cited. The appellants here are purchasers of the lands after decree and under express exception thereof from the covenants of warranty. Their purchase, so far as concerns the lands here involved, was speculative. On the other hand, the Smoky Mountain Company was a good-faith purchaser for value and in reliance upon the decree.

In Thompson v. Maxwell, 95 U. S. 391, 397, 398 (24 L. Ed. 481), it is said that "none but parties and privies can have a bill of review. It does not lie for assignees;" and that the fact that the original defendants were joined as complainants with their assignees does not obviate the difficulty. But we do not decide that an assignee cannot, under any circumstances, file a bill of review, nor that this case is controlled by Thompson v. Maxwell, nor that the mere fact of a good-faith purchase by a party in reliance upon, but not under, a decree precludes the review and reversal of that decree. What we do mean to decide is that in our opinion, taking into account not only the speculative purchase by appellants, but also the good-faith purchase by the Smoky Mountain Company, a case is not presented which appeals to the equitable discretion of the court to allow the review of a decree upon the ground alone of newly discovered evidence. We rest our decision solely upon this proposition. Bearing in mind the rule that this bill of review for newly discovered evidence is not of right, no matter how persuasive of error in the original decree the new evidence may be, and that it should not be allowed if such allowance would result in mischief to innocent parties, and having in view the stability necessary to be afforded to decrees, especially of courts of last resort, where disturbance thereof is not essential to the protection of the real equities of the parties before the court, we think the review asked for should be denied. In our opinion, the stability of judgments, and thus the protection of rights acquired in reliance upon them, are such as, under the peculiar circumstances of this case, to make the review asked for inequitable. Nor do we think the situation is changed by the fact of the conveyance by Belding and his associates to the trustees pending the suit, nor by the fact that appellants were negotiating for, and possibly may be said to have had, to some extent, an option for the purchase of the land previous to the final decree. The appellants were not bound to make the purchase until contract therefore was actually made, which was after the decree sought to be

reviewed was entered; and the purchase then made, as has been said, was speculative as to the land here involved.

It is urged that the Smoky Mountain Company is not a good-faith purchaser, because of an option taken by Peck and his associates previous to the decree of this court. But even if the Smoky Mountain Company or its grantors derived any interest from the Peck option, which does not clearly appear, the actual purchase was not in fact made until after the decree of this court, and is shown to have been made with knowledge of and reliance upon that decree, and thus the earlier option could not affect the status of the Smoky Mountain Company as a good-faith purchaser.

It is urged that the original defendant lost his land by the decree of the court, and that the court was the means by which this result came about. But this court committed no error. It decided rightly upon the case presented to it. It was the misfortune of the defendants that the map was not discovered before the hearing of the original cause. But the reversal of this decree would result, on the one hand, not in benefit to the original defendants, but to purchasers of their rights after the unfavorable decree was made, and, on the other hand, to the detriment of those who bought in reliance upon that decree. Proceedings under bills of review are in the nature of applications for rehearings or new trials. In Pomeroy v. Noud, 145 Mich. 37, 44, 108 N. W. 498, it is said that the rules governing the granting of bills of review are, to some extent, founded upon considerations of public policy as well as those of private rights.

[3] We have not overlooked the fact that the deed from Hebard to Blaisdell and his associates contained no covenants of warranty, except as against those claiming under the grantor, and that the deed to the Smoky Mountain Company was a quitclaim deed. But such facts are not controlling. A person holding under a quitclaim deed may be a bona fide purchaser. Moelle v. Sherwood, 148 U. S. 21, 28, 30, 13 Sup. Ct. 426, 37 L. Ed. 350; United States v. California & Oregon Land Co., 148 U. S. 31, 13 Sup. Ct. 458, 37 L. Ed. 354. In Moelle v. Sherwood, Justice Field, speaking for the court, said:

"The doctrine expressed in many cases that the grantee in a quitclaim deed cannot be treated as a bona fide purchaser does not seem to rest upon any sound principle."

And again:

"The character of a bona fide purchaser must depend upon attending circumstances or proof as to the transaction, and does not arise, as often, though, we think, inadvertently, said, either from the form of the conveyance or the presence or the absence of any accompanying warranty. Whether the grantee is to be treated as taking a mere speculative chance in property, or a clear title, must depend on the character of the title of the grantor when he made the conveyance; and the opportunities afforded the grantee of ascertaining this fact and the diligence with which he has prosecuted them will, besides the payment of a reasonable consideration, determine the bona fide nature of the transaction on his part."

[4] It is true that the specific proposition upon which we rest our decision was not in terms presented by answer, but we think that the defense as presented, in connection with the objection to granting

leave to file a bill of review, is sufficient to properly present it to this court. In reaching this conclusion, we have not overlooked the fact that leave to file the bill was granted by the Circuit Court. In our opinion, however, the granting of such leave, especially under the conditions we have before set out, was not so far an adjudication of the equities of the cause as to preclude their review. An order allowing the filing of a bill of review is not appealable, while an order denying permission is final and appealable. Maxfield v. Freeman, 39 Mich. 64; Scriven v. Hursh, 39 Mich. 98. Unless, therefore, this defense may be considered upon final hearing, the decision of the Circuit Court granting the leave to file could never be reviewed. But, this consideration apart, we think the party against whom a bill of review is filed is not foreclosed from a defense of this nature by the mere granting of leave, especially where, as in this case, both this court and the Circuit Court have apparently refrained from adjudicating anything except the leave to file. See Massie's Heirs v. Graham's Adm'rs, 3 McLean, 41, 48, Fed. Cas. No. 9,263.

For the reasons above stated, the decree of the Circuit Court, dismissing the bill of review, must be affirmed.

SEVERENS, Circuit Judge (dissenting). For the reasons stated in the following opinion, I am unable to agree with the majority of the court or with the reasoning on which their conclusion is based. Inasmuch as the statement of facts contained in the opinion of the other judges is not, as I think, sufficiently full to disclose the whole case and omits to mention several important facts material to the proper disposition of it, I am constrained to state the case in my own way.

This is an appeal from a decree of the Circuit Court dismissing a bill of review which was allowed to be filed there by the consent of this court given upon a petition filed here August 6, 1907. The decree which was complained of was made by this court on an appeal, July 13, 1900, affirming the decree of the Circuit Court. The reasons which induced this court to affirm the decree of the court below are stated in the opinion by Judge Lurton reported in 103 Fed. 532, 43 C. C. A. 296. The object of the original bill was to obtain an injunction to restrain trespassers on certain described lands alleged by the complainant to be in Tennessee and to belong to him, and to obtain a decree quieting the complainant's title to said lands. The compl. inant claimed title under a grant from the state of Tennessee. The answer of the defendants averred that the lands were not in Tennessee, but were in North Carolina, and claimed title in themselves under grants from the latter state. The lands lie along the boundary line between the two states, and the question was which of the two lines claimed by the respective parties to be the boundary was the true boundary line, for the lands in controversy lie between those lines. This was the sole question in controversy. The regularity of the derivation of the titles was not disputed on either side. The following excerpt from the statement of facts prefacing the opinion of the court will explain the history of the respective grants, the steps which had

been taken by the public authorities of the two states to ascertain and settle the boundary line and the character of the lands in controversy:

"The territory now comprising the state of Tennessee was ceded by the state of North Carolina in 1789 [2 Ired. & B. Rev. St. p. 171] to the United States. The Session Act describes the eastern boundary line as follows: 'Beginning on the extreme height of the Stone Mountain, at the place where the Virginia line intersects it, running thence along the extreme height of the said mountain to the place where the Wautauga river breaks through it; thence a direct course to the top of the Yellow Mountain, where Bright's road crosses the same; thence along the ridge of said mountain, between the waters of Doe river and the waters of Rock creek, to the place where the road crosses the Iron Mountain; from thence along the extreme height of said mountain to where Nolichucky river runs through the same; thence to the top of the Bald Mountain; thence along the extreme height of the said mountain to the Painted Rock, on French Broad river; thence along the highest ridge of the said mountain to the place where it is called the "Great Iron" or "Smoky" Mountain; thence along the extreme height of the said mountain to the place where it is called "Unicoy" or "Unaka" Mountain, between the Indian towns Cowee and Old Chota; thence along the main ridge of the said mountain to the southern boundary of this state.' The line here to be ascertain is included within the call beginning 'thence along the extreme height of the said mountain to the place where it is called Unicoy or Unaka Mountain.' The mountain whose extreme height is to be followed until Unaka Mountain is reached is the 'Great Iron or Smoky Mountain.' The necessity for a definite location and marking of the line became evident to both states, and in 1821, under acts passed by each state, a joint commission was appointed for the purpose of settling, running, and re-marking the boundary line. The Tennessee commissioners were appointed under an act which provided that the commissioners should 'settle, run and remark the boundary line between this state and the state of North Carolina, agreeably to the true intent and meaning of the said act of the General Assembly of the State of North Carolina, entitled: "An act for the purpose of ceding to the United States of America certain western lands therein described."' Acts Tenn. 1820, c. 22 [2 Scott's Laws, p. 635]. The North Carolina act, providing for the running of the line, was substantially identical with the Tennessee statute above set out. 2 Ired. & B. Rev. St. N. C. p. 94. The joint commissioners did run and re-mark the line, and each state passed an act ratifying, confirming, and adopting the line as run and reported by the commissioners. Acts Tenn. 1821, p. 45, c. 35; 2 Ired. & B. Rev. St. N. C. p. 96."

It will be sufficient for the present purpose to state that the line run by the commissioners as claimed by the plaintiff in the original suit would be a line starting from a known point where the disputed lines separate northeast of the land in controversy and extending southwardly and somewhat westwardly over what is known as Hangover Rock to another known point where the disputed lines converge. If this were the true line, these lands lie in Tennessee. The line which the defendants in the original suit claimed was the one run by the commissioners starts from or near the same point as the other, but diverging therefrom extends more to the right, as one looks to the southwest, and passes over the Fodder Stack range of heights to the converging point. This line lies west of these lands and would locate them in North Carolina. The evidence in the original case showed that there were signs and marks along each line, the character of which is stated in Judge Lurton's opinion on the original case. On the Fodder Stack ridge line there were 41 trees marked like those on the general and undisputed line established by the commissioners. This court

thought the probability was that these trees were thus marked by the commissioners, but concluded that this line was only temporarily run, and was afterwards abandoned, and the Hangover Rock line substituted. We need not go into the various reasons which led the court to conclude that the Hangover Rock line was the true boundary line. The necessary result was that the land in question passed by the Tennessee grant, and that, therefore, the complainant was the true owner; and the court decreed accordingly. Counsel for the defendant remind the court with great earnestness of the importance to the public of the stability of judgments. But it is of even higher interest to the public that the citizen shall not be despoiled by a wrong judgment. It is for the prevention of such unjust consequences that the law gives to the courts the power of correction by a bill of review. It is an ancient principle of equity that, if a man shall lose his property to his adversary by the decree of the court, he still retains the right to regain it, if, by subsequent discovery of hitherto unknown proof bearing directly on the issue, he is able to convince the court that its decree was clearly wrong. This right is one to which the right acquired by the decree is subordinate, and neither the opposite party nor any one claiming under him can successfully deny that right, so long as the true owner has done no act either of commission or omission, whereby he should be estopped from claiming it.

When the former suit was pending nothing of the work of the commissioners was to be found in the archives of either state, although diligent search was made. The state house of North Carolina at Raleigh was burned in 1831, and its archives nearly all destroyed. But what had become of the report of the commissioners which came to the state of Tennessee no one could explain. The court had only scant means for locating the line, and was in doubt about the conclusion to be drawn from what it had, but based its judgment upon the probabilities as they seemed to be. But about the beginning of the year 1904 and after the three years which a statute of Tennessee prescribes as a limitation for bills of review had elapsed, the report of the commissioners and the map which accompanied it belonging to the state of Tennessee were discovered in a barrel of rubbish in the basement of the capitol of the state at Nashville, which the state authorities had ordered to be cleaned out. The rumor of this discovery spread abroad and came to an agent of the defendants residing in North Carolina. The grants of these lands by the state of North Carolina were made upon sales made during the years 1853, '54, '55, and '56. That by the state of Tennessee was made in 1892, and probably was at a time subsequent to the time of the disappearance of the commissioners' report and map. I say "probably," because it is hardly to be credited that the official who had charge of the making of the grant would have allowed it if he had knowledge of the action of the commissioners. But it is possible that the making of this grant was the result of the seemingly loose practice of the land department of that state which is stated thus by Judge Caruthers in State v. Crutchfield, 3 Head (Tenn.) 113, at page 115:

"The state does not warrant the title to the land which she grants. She opens her offices, and permits individuals to enter, at their own risk, any

lands they choose, and she issues her grants. They must beware of the titles they get."

The lands were wild, rough, and uncultivated, and almost unsettled, and were valuable mainly for their ore mines and timber.

The state of Tennessee at one time caused a survey and sectionizing to be made of lands in this locality. Of this survey Judge Clark in his opinion in the original case said:

"That the state has through the Ocoee District commissioners established its line on Slick Rock creek, and has sectionized all the territory supposed to belong to the state."

This survey and sectionizing took place in 1836, and Slick Rock creek is on the line running over the Fodder Stack range. Aside from the making of the grants, neither state had made any distinct claim of territorial dominion. Taxes have been assessed upon them by the state of North Carolina, and they have been paid by the appellants or their predecessors in title. And recently the appellees have paid taxes to the state of Tennessee. The complainant in the original suit alleged that he was in possession, but this statement was not supported by the evidence. Judge Clark, in the opinion on which he based his decree, said:

"After careful consideration of this case, I reach the conclusion that I am not warranted upon the facts in differing from the commissioner in the view which he takes of the case. It is a very close one on the facts, and the equity of the case is rather with the defendants in view of the fact that they obtained their grants earlier, and have been paying taxes upon the property while the plaintiff's grant was only recently obtained."

The report and map of the commissioners above mentioned were put in evidence in the court below in this proceeding, and are now before us. The authenticity of them is not disputed. The map shows the line run by the commissioners in distinct color, and it shows the line as it was contended to be by the defendants in the original case, and is the line running over the Fodder Stack ridge, and is on the line of the 41 marked trees above mentioned. The inevitable conclusion is that the original decree was erroneous. The appellees contend vigorously that these documents are not conclusive, and still insist that the true line runs over by Hangover Rock. But it is, as I think, a hopeless contest, and my conviction that the map shows the true line is in no wise shaken. What is the result of this conclusion if it is correct? It must be that these lands lie in North Carolina, that the appellees had no title, and that the appellants are the lawful owners of them.

Counsel for appellants urge that, where it is found that the lands are not within the territorial limits of Tennessee, the jurisdiction of the Circuit Court fails, and that the order should be that the bill be dismissed on that ground. This objection was presented to the Supreme Court in boundary cases at an early day, and was overruled, the court being of opinion that, if upon the allegations of the bill the land is within the territorial jurisdiction of the court, that is enough, and that its authority will not be divested by its final conclusion that the land is located in an adjoining state. Fowler v. Miller, 3 Dall.

411, 1 L. Ed. 658; New York v. Connecticut, 4 Dall. 1, 1 L. Ed. 715; Handly v. Anthony, 5 Wheat. 374, 5 L. Ed. 113; Rhode Island v. Massachusetts, 12 Pet. 657, 726, 727, 9 L. Ed. 1233; Howard v. Ingersoll, 13 How. 381, 14 L. Ed. 189.

On the merits the conclusion above stated is fatal to the claim of the appellees. The bald, but perfectly true, state of the case is this: The real owners of the property have defended it against a claimant having in truth no interest in it by all the lawful means available to them, but by the adverse decision of the court the owners have lost it. The court has been the instrumentality by which this grievous miscarriage had been accomplished. It does, indeed, sometimes happen that by error or accident such injustice is done and is irremediable; but it certainly ought not to happen by the conscious act or omission of the court while it yet has the power and opportunity to prevent the mischief.

The only question in the case at the original hearing was that of the location of the boundary line between the states. The new evidence seems to be conclusive of that question. It is difficult to conceive of a case more suitable for the remedy now invoked.

But the appellees, apprehending that perhaps the court would come to the foregoing conclusion in respect to the boundary line upon the new facts, interpose a great variety of objections to the relief prayed, among them these: First, it is urged that these complainants are not persons aggrieved by the original decree; and, further, as they contend, the parties in whose behalf the bill of review is filed are assignees, in whose favor the court will not review the decree. These contentions are directed to the ultimate question, namely, whether they have any interest affected by the decree which entitles them to the relief which they seek. The first of these, that these complainants were not aggrieved, does not merit prolonged discussion, certainly not, if this bill is to be treated as a bill by the original defendants as I think it should. The second, concerning the rights on such a bill, is more serious, and is the principle ground as I understand on which the court is to affirm the decision of the court below. The general rule is stated by the Lord Chief Baron Gilbert in his book on the Chancery Practice entitled Forum Romanum at page 186, which is this:

"None but parties and privies, such as heirs, executors, or administrators, can have this bill of review, since nobody else can be aggrieved by such decree because it can only be revived upon such privies."

Mr. Justice Story in his work on Equity Pleadings, note to section 409, in quoting this language uses the word "by" instead of "upon" in the last line. But I suppose this is an error, as the original publication has it "upon." This rule has been stated and followed in many judicial opinions, and is no doubt the foundation of the practice of the court. Some qualifications to its generality, however, have been made where the special circumstances require it, which is an incident to all general rules. And Mr. Justice Story in the note above mentioned says: "This language is very broad, and requires qualification." And he proceeds to state several of such.

The majority of the court treat this bill of review as one brought by assignees, and not as one brought by the parties to the original decree to enforce their own rights. While it is true that the petition filed in this court for permission to make application to the Circuit Court for leave to file it was presented by the "assignees," as we will call them, the bill which was allowed by the Circuit Court to be filed is the bill of the original defendants themselves as complainants, and they pray in their bill that they may be allowed to file it. The case stated is the case of those parties. The relief prayed is in their own behalf, and the bill is signed by their solicitors. No statement of any facts in behalf of any other persons than themselves is made—nor, indeed, is there any reference to the rights or interests of any other person. They thus became parties to the suit, and subject to the jurisdiction of the court, and would be bound by the decree which the court should render. The discretion of the Circuit Court as to whether leave to file should be granted was invoked and exercised and at no time was its permission to file the bill recalled. Nor does the fact that the other parties assisted in the promotion of the suit consitute an objection. They had an interest which they might subserve without censure.

It would seem from the rule approved by the Supreme Court upon the authority of the Lord Chief Baron Gilbert's book that the original parties and their privies by representation who were bound by the decree are the only ones properly joined in the suit. Thompson v. Maxwell, 95 U. S. 397, 24 L. Ed. 481; Gies v. Green, 42 Mich. 107, 3 N. W. 283. Nevertheless, a purchaser subsequent to the decree was allowed to intervene as defendant.

But, passing by this objection for the present, I proceed to inquire whether the parties complainants are so affected by the original decree that they are entitled to maintain a bill of review. The original defendants are aggrieved because the decree cut them out of the interest they had in the lands subject to the deed in trust to Archer and McGarry, and so affected the value of the title conveyed in trust as to materially depreciate the price that could be obtained for it, and the extent to which their debt would be paid. This deed in trust was made pendente lite. The deed of the trustees was offered in evidence by the defendant, and is therefore evidence of any disserving statements made in it. 1 Wharton's Evidence, § 619. Turning to the deed itself, it appears to have been given to carry into effect certain trust agreements entered into before the making of the final decree. It was of these and other lands to secure a large indebtedness, a very considerable portion of which was due to Archer, one of the trustees. It contained a power of sale, the power being coupled with an interest, and was irrevocable. The good faith of the transaction is not questioned. It was therefore perfectly valid in law and in equity. Hartley v. Russell, 2 Simons & Stuart, 244; Hartington v. Long, 2 Myl. & K. 590. To be sure, the grantees would be bound by the decree if one should be finally entered against the grantors. This because of the rule which the court applies for the maintenance of existing conditions and consequently of its jurisdiction to make an ef-

fective decree. The fact that the grant was made pendente lite has no other consequence. In earlier times the courts looked with dis-favor upon a purchase pendente lite, not only because of its disturbance of the status quo, but also because it afforded an opportunity for maintenance and champerty. To avoid the first of these objections, the rule that the purchaser should be bound by the judgment was applied. With respect to the subject of maintenance and champerty, the objection has lost much of its force, and is now only sustained upon a plain case. It is not sustained where the purchaser has an interest in the subject of the litigation, but only when he comes in as a volunteer, to assist the party from whom he buys. 6 Cyc. 865, where the subject is fully treated and numerous authorities are cited in support of the rule just stated. After the transfer by the defendants, they, to the extent of the interest transferred, continued as representatives of the transferee as was said by Chief Justice Waite in Stout v. Lye, 103 U. S. 66, 26 L. Ed. 428, and repeated by Mr. Justice Brewer in Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371, 386, 14 Sup. Ct. 122, 37 L. Ed. 1113. Archer and the other creditors sought to obtain this security for their debt, and, if we look to ultimate justice, it would be more just that the debt of the real owner should be paid to his creditors, rather than that the fund should go to a stranger to that ownership. If the purchasers from the trustees would have no other means of protection, it would seem that they should have such a right as the trustees had. It was necessary that there should be purchasers, else the power of the trustees could not be executed. The title would not be marketable, and would remain stagnant in their hands. But we need not pursue this subject. It is enough that the original defendants are in due form before the court, and were injured by the decree. And it is of no concern whatever to the defendant in this bill what use the complainants make of the fruits of the decree, as, for instance, whether they shall thereby make good their own conveyance to their grantee. Counsel for defendants maintain in effect that, notwithstanding the original decree had the effect to pass the title from the defendants to the complainant, no one was aggrieved thereby.

I have been induced to discuss these questions touching the interests of parties deriving such interests from one of the parties to the original suit, but who were not themselves parties because the case has been presented and argued as if such questions were open on a bill of review. It is only by such an assumption that the presence of the Smoky Mountain, etc., Company can be recognized; for its rights are only such as it has derived since the decree sought to be reviewed. Thus on both sides proofs have been introduced as if new issues could be raised and decided in this proceeding, a proposition which I doubt. There are some precedents cited by counsel wherein, as is claimed, such a broad jurisdiction has been exercised on a bill of review. But it seems manifest that this practice destroys the proper limitations of such a proceeding and confounds it with the proceedings of an ordinary suit in equity; and it is inconsistent with the equity practice of the federal courts. It is a singular circumstance

that in this case the defense is made by a party who, under the rule referred to, could not properly be made a party to the proceeding at all. But proceeding, further, another objection is that:

"A bill of review will not affect the title of a bona fide purchaser (of the property in controversy) from the successful party after a final decree and without notice that a bill of review is to be filed."

Now, whatever application such a rule may have to a bill filed to review a decree for error apparent on the face of it, it can have none to a case where the bill is filed on account of newly discovered evidence of which the plaintiff in most cases would have no knowledge and no definite hope of discovery. Moreover, how is he to give notice of an intention to file such a bill? And to whom must the notice be given? How is he to know who is an intending purchaser? In this connection it may be worth while to remark that the original complainant lost no time in disposing of the lands to another after the decree of this court was entered. Only a few days elapsed after the decree before he had sold it, and it was conveyed before the time had elapsed for moving for a rehearing or applying for a certiorari. If in such circumstances a man may cut off the true owner by forthwith conveying away the property, then, as said by the Court of Appeals of Kentucky, a bill of review is of little value. Clark's Heirs v. Farrow, 10 B. Mon. 446, 451, 52 Am. Dec. 552. This point is made in the interest of the Smoky Mountain, etc., Company, which claims to be a bona fide purchaser. Admitting it to have that character, for the sake of argument, it would not suffice to defeat the claim of the complainants; for it never acquired the title to the property, and it is only in such case that a bona fide purchaser can have protection. 1 Story's Eq. Jur. § 64. The grant of the state of Tennessee conveyed no title, legal or equitable, and the grantor of the Smoky Mountain, etc., Company, had no title to sell and nothing passed by the deed. Non dat qui non habet is a maxim of the law, as well as sound logic. An apparent title is not always enough; as, for instance, when the name of the true owner has been forged, or the grantor was under a disability, or when, for any reason, the deed conveyed no title. The defendants in the former suit, who are complainants here, derived the true title from the state of North Carolina. It was of a fee simple absolute, the highest and best title known to the law. The owner of property cannot be deprived of it without some fraud or fault on his part by a bona fide purchase of it by another from some other party than the owner. In 2 Pomeroy's Eq. Jur. § 735, the author says:

"A subsequent holder, even for a valuable consideration and without notice, has certainly no higher right than a prior holder equally innocent and with an equally meritorious ownership. American courts seem sometimes to have acted upon exactly the opposite notion, and to have assumed that a subsequent title was necessarily the better one. When the original legal owner has done or omitted something by which it was made possible that his property should come into the hands of a bona fide holder by an apparently valid title, it may be just to regard him as estopped from asserting his ownership, and thus to protect the subsequent purchaser. But when the prior legal owner is wholly innocent, has done and omitted nothing, it

certainly transcends, even if it does not violate, the principles of equity to sustain the claims of a subsequent and even bona fide purchaser."

And again, after an extended discussion of the subject, he says at the close of section 739:

"The foregoing description shows that it is wholly unwarranted by the settled principles of equity for a court to sustain and enforce the subsequent legal estate acquired by A. in any kind of property or thing in action merely because he is a bona' fide purchaser for a valuable consideration without notice against the prior legal and equally innocent owner, B., or even to sustain A.'s defense as a bona fide purchaser in a suit brought by B."

It seems to me that this doctrine rests upon a fundamental principle, and is indisputable. It has been recognized and enforced by the federal courts in several cases. Vattier v. Hinde, 7 Pet. 252, 8 L. Ed. 675; Boone ʍ. Chiles, 10 Pet. 212, 9 L. Ed. 388; Smith v. Orton, 131 U. S. Appendix lxxviii, 18 L. Ed. 62; Texas Lumber Mfg. Co. v. Branch, 60 Fed. 201, 8 C. C. A. 562. Lindblom v. Rocks, 146 Fed. 660, 77 C. C. A. 86. Judge Gilbert, in this last case, puts the matter in a nutshell when he says:

"The doctrine of bona fide purchaser without notice does not apply where the purchaser buys no title at all. His good faith cannot create title."

In the case of Texas Lumber Mfg. Co. v. Branch, supra, the deed to the bona fide purchaser for a valuable consideration stated that the grantors were the heirs of the deceased owner, and the purchaser supposed that to be so. But it turned out that another was the lawful heir, and the property was decreed to him. See, also, Latham v. Barney (C. C.) 14 Fed. 433, 446. The doctrine concerning bona fide purchaser has been built up and has always rested upon the assumption that the purchaser paying value, has acquired a title, in the enjoyment of which a court of equity will protect him. At one time the court of chancery pressed the rule so far as to permit the purchaser to get hold of the title by seizing the evidence of it by any means in his power, even by trespass if he could. This excess was subsequently disallowed. But the requirement that the purchaser must have a title in order to enable him to call for the protection of the court has always continued to be regarded as an essential condition; and, indeed, upon sound reason, it must be so.

The cases of Rector v. Fitzgerald, 59 Fed. 808, 8 C. C. A. 277, and Ohio R. Co. v. Fisher, 115 Fed. 929, 53 C. C. A. 411, which are relied on by the defendants, decide nothing opposed to this. In the first of these cases it appears from Judge Thayer's statement that the bona fide purchaser had acquired the legal title. And the references which Judge Thayer makes indicate that Rector had been seeking to defeat the title which the defendant who was the grantor of the bona fide purchaser, had acquired, and to obtain a declaration that he was himself entitled to it. The case finally turned on the question of the laches of the plaintiff in filing his bill. The other case, that of Ohio River R. Co. v. Fisher, was not one of a bill of review, but it involved facts and proceedings occurring after an original decree and the filing of a bill of review. The railway com-

pany had become a purchaser for value through a sale and conveyance by the trustees under a will. The trustees held the legal title and the railway company had acquired it by their deed. Judge Simonton referred to the case of Bank v. Ritchie, 8 Pet. 146, 8 L. Ed. 890, where Chief Justice Marshall distinguished such a case from one where the title had not been acquired by the purchaser, at least that was the interpretation of it by the learned judge. The same observations apply to the case of Perkins v. Pfalzgraff, reported in 60 W. Va. 121, 53 S. E. 913.

The notion that, because at the time these lands were purchased of the complainant in the original suit he had obtained a judgment in his favor which precluded the defendant from asserting title to the lands, he might ever afterwards rely upon the estoppel by which the defendant was then bound, is unsound. On the contrary, the true rule is that, when the ground on which the estoppel of the judgment rests is removed and the truth is let in, the estoppel collapses and the structure built upon it falls to the ground; whereupon there must be restitution of that which by the previous error of the court the party has been unjustly deprived of. 2 Foster's Federal Practice (4th Ed.) 1132; Mitford's Ch. Pl. 107, 89. Cases where judicial sales made in pursuance of decrees, and before the reversal of such decrees have been protected in the hands of purchasers at such sales, rest upon the security which must be afforded to the purchaser in relying upon the action of the court. It is necessary that the purchaser should have such confidence or sales could not be made for the proper value. Moreover, the price inures to the benefit of the true owner. What would be thought of such a case, if the court in addition to divesting the owner of his title should also deprive him of the proceeds? The rule itself results from a balance of inconveniences, the one which the owner suffers from a forced sale of his property and the other in depriving the purchaser of the necessary safeguard which the general interest of the public requires. Such cases have no application to an ordinary sale made after the court lets go its hold, and leaves the property to the ordinary incidents of business transactions. The distinction is stated by Gilfillan, C. J., in Lord v. Hawkins, 39 Minn. 73, 38 N. W. 689, as follows:

"The second question in this case is, Does a purchaser in good faith from a successful party in a judgment determining the title to real estate come within the rule which protects a bona fide purchaser under a judicial sale: that is, a sale made pursuant to a judgment or to enforce a judgment, from the effect of a subsequent reversal or vacation of the judgment? The reason for the rule is obvious, and suggests the answer to the question. It is founded upon considerations of public policy, which require that property shall not be sacrificed at sales that the law makes, that at such sales purchasers shall be encouraged to bid a fair price. And this cannot be effected if the title they acquire is subject to be defeated in consequence of errors or irregularities in the judgment under or pursuant to which the sale is made. This is no such case. Here was no sale nor anything equivalent to a sale. The judgment did not assume to pass any title. It passed on only the previously existing title like an action in trespass or ejectment. The appellant purchased from the party and took only the title that he had."

194 F.—21

In 24 Cyc. 6, it is said:

"A sale is not a judicial sale, properly speaking, unless it is made under an order of the court, and subject to confirmation of the court [citing a number of cases]."

This distinction is highly important in the present case.

Another ground taken in defense, but not alluded to by the other judges, is that the bill of review is barred by a statute of limitations of the state of Tennessee which is as follows:

"No bill of review shall be brought, or a motion made therefor, except within three years from the time of pronouncing the decree; saving to infants, married women, persons of unsound mind, imprisoned or beyond the limits of the United States, a right to a bill of review within three years after such disability has been removed." Shannon's Code, § 4848.

I should suppose that this statute was intended to apply only to bills of review for errors appearing of record; for, if it be applicable to bills filed because of newly discovered evidence, the result would be that parties who have no knowledge of such evidence would be cut off at the end of three years, and many cases might arise where the new evidence might not have been discovered before the period of this limitation should elapse, and yet be of such a character as to show that great injustice had been done. It has always been a favorite doctrine in courts of equity that the time for limiting recourse to those courts should begin when the cause of action is discovered, and some of the states have enacted statutes extending this rule to all cases whether at law or equity. But I am of opinion that, if it be conceded that this statute was meant to include all bills of review, it is not a law which binds the courts of the United States. It was enacted for the regulation of the procedure in the courts of the state. The Legislature of the state had not the power to regulate the procedure of the courts of equity of the United States. Nor, indeed, has it the power by its own authority to regulate the procedure in any actions in the federal courts. Congress has power to adopt such legislation, and has done so in respect to actions at law. But the act expressly excludes suits in equity and in admiralty from the rules prescribed by state legislation for actions at law. Nor can a state prescribe a law which restricts the equitable jurisdiction of the federal courts. It may indirectly extend the jurisdiction of those courts by supplying new conditions wherein the federal courts, without departing from their own fundamental principles, may exercise equitable jurisdiction. The consequence of applying the statute of Tennessee to cases such as this would defeat the exercise of jurisdiction by the equity court of the United States in all cases of bills of review filed after three years from the original decree, although the courts of equity have hitherto and through a long period of time taken jurisdiction and decreed relief in many cases where a much longer period had elapsed. And this further result would happen, that the power of the court existing in other states would be restricted in the state of Tennessee to a part only of its familiar jurisdiction. As we said in Kentucky Coal & Timber Co. v. Kentucky Union Co. (C. C. A.) 187 Fed. 948:

"State statutes of limitation are prescribed for the tribunals of the state. They are not ex proprio vigore of any force in the courts of the United States. They may be, and in many instances have been, adopted by acts of Congress as laws of the United States. There is no general statute of limitations in the laws of the United States relating to suits in equity. But, speaking now of the equity courts of the United States, there has been, for the sake of conformity, a disposition to accept the statutory regulations of the states prescribing the time within which suits may be brought. And this practice has ripened into a rule which will be enforced whenever by observing it the court is not required to abrogate its own principles, in which case it will protect its own jurisdiction. Alsop v. Riker, 155 U. S. 448, 460 [15 Sup. Ct. 162, 39 L. Ed. 218]; Patterson v. Hewitt, 195 U. S. 309 [25 Sup. Ct. 35, 49 L. Ed. 214]. Instances are found where those courts have enforced the doctrine of laches in favor of defendants where the lapse of time has been shorter than that prescribed by state laws, but where the peculiar circumstances gave rise to an equity which the court was bound to protect. By the same token it would allow a longer period for bringing suit than that prescribed, when by fraud or concealment of the cause of action had not been discovered, or would not by reasonable diligence have been discovered."

This brings us to the last defense which the defendants make, which I think it material to notice. This is, that the complainants have been guilty of laches in taking measures to obtain leave to file the bill. There is no statute of the United States which limits the time for filing a bill of review. The general rule is that the party should move within a reasonable time after discovering the new evidence. It is a question of laches. In many cases it has been tested by the analogy of statutes fixing the time for taking an appeal from the original decree. But this has never been regarded as an absolute rule in applying the doctrine of laches. But, by whatever rule the matter is to be tested, I think there was in this case no such delay as should bar the remedy. The complainants were nonresidents. They had an agent in Cherokee county, N. C., who had charge of lands they held in that state, and apparently of those in Tennessee. He testified that he first heard a rumor that the map had been found in February, 1906; that he at once set about verifying it; that in March of that year he obtained a copy of the map; that he tried to find out whether the field notes of the commissioners could be found at Nashville: that he made trips to Raleigh, N. C., and made thorough search of the state archives there, for the map, the report and the field notes of the North Carolina commissioners, which he hoped to find there, but failed to find them; that, when he had secured all that he could find, the matter was placed in the hands of local attorneys The details of his search are stated more at length in his testimony. It appears that subsequently counsel at Cincinnati was employed to assist. The petition for leave to file the bill of review was filed by the counsel at Cincinnati, August 6, 1907. It does not appear that any change of conditions occurred meantime.

Reference is also made in the opinion of the majority of the court to the character of the appeal, and it is suggested that it is the appeal of the "assignees." But I think, when construed by the whole record, it may properly be regarded as the appeal of the original parties. The privilege of prosecuting the suit in the court below would

seem to carry with it the right to appeal if there should be occasion. As elsewhere said, the bill presented only a controversy to which the original defendants were parties plaintiff, and it is plain that that was the controversy intende to be removed to the appellate court. Evidently the parties have so understood it. There has been no motion to discuss the appeal, and it has been argued and submitted without any controversy on that point. This court has, instead of dismissing the appeal as it should have done if it was deemed fatally defective, entertained it, considered the case on its merits and now affirms the decree.

Restoration of the premises is, as I have said, an incident to the remedy. The remedy of the grantee of the baseless title in such a case would seem to be an action against his grantor to recover the consideration paid.

The proper order would be to reverse the decree of the Circuit Court, and to direct that the original decree be reversed, and the original bill dismissed, and for a restoration of the possession of the premises.